**Patricia C. ANDERSON, Michael A. Hosein and Stephen E. Parker, Plaintiffs–Appellees,**

**v.**

**Alexander F. TREADWELL, as Secretary of State of the State of New York, Defendant–Appellant.**

**Docket No. 01–7954.**

United States Court of Appeals, Second Circuit.

Argued April 4, 2002.

Decided June 25, 2002.

Andrew G. Celli, Jr., Office of N.Y. State Atty. Gen., New York, NY, (Eliot Spitzer, N.Y. State Atty. Gen., Michael S. Belohlavek, New York, NY, on the brief), for Defendant–Appellant.

Michael T. Wallender, Albany, NY, (Howard W. Goldson, Goldson/Nolan Associates, LLP, Melville, NY, on the brief), for Plaintiffs–Appellees.

Before NEWMAN, KEARSE, and LEVAL, Circuit Judges.

JON O. NEWMAN, Senior Circuit Judge.

This appeal requires us to decide whether a state's regulation of residential real estate solicitations by licensed real estate salespersons violates their free speech rights under the First Amendment. Defendant–Appellant Alexander Treadwell, New York's Secretary of State, appeals from the June 29, 2001, judgment of the United States District Court for the Eastern District of New York (Thomas C. Platt, District Judge), granting summary judgment to Plaintiffs–Appellees Patricia Anderson, Michael A. Hosein, and Stephen E. Parker, real estate sales licensees, who challenged the constitutionality of N.Y. Real Prop. Law § 442–h(3) (McKinney 2001) on its face and as applied, and regulations promulgated under the statute. The District Court ruled unconstitutional subsection 442–h(3) and the regulations establishing "cease-and-desist zones" in which homeowners can elect not to receive at-home real estate solicitations. Judge Platt concluded that the regulatory scheme lacked a "reasonable fit" between the State's alleged interest in homeowner privacy and the means chosen to serve that

interest. For the reasons stated below, we reject the Appellees' constitutional challenges and therefore reverse.

## Background

■ New York Human Rights Law § 296(3–b) outlaws "blockbusting"—the practice of soliciting real estate sales and listings by representing that a change in the racial, ethnic, or religious character of a block, neighborhood, or area is underway.[1] As we have previously recognized, "[i]n its most systematic and crudest form, blockbusting entails the 'churning' of a local real estate market, a practice in which real estate brokers engage in frenzied solicitation practices that prey upon the racial and ethnic fears of persons residing in transitional neighborhoods as a means for increasing the volume of residential real estate transactions. While realtors gain the benefit of the commissions generated by the increase in sales, homeowners and communities suffer the detriment of declining property values and neighborhood instability brought on by panic selling, the fanning of racial tensions and promoting of ethnic stereotypes." *New York State Association of Realtors, Inc. v. Shaffer*, 27 F.3d 834, 835–36 (2d Cir.1994) ("*NYSAR*"). *NYSAR* thus recognized that "blockbusting" is not only the solicitation of homeowners to sell their homes out of fear of changing neighborhood demographics but also the harmful effects that result when such solicitations precipitate home sales.

In 1989, in an effort to enforce its ban on blockbusting, the New York State Legislature enacted Real Property Law § 442–h. As enacted, subsection 442–h(2) allows the Secretary of State to find, after public hearing and investigation, that a defined geographic area is subject to blockbusting, and to adopt a "nonsolicitation order" forbidding all solicitations of residential real estate listings or sales from any homeowner within that zone. Subsection 442–h(3) authorizes the Secretary, upon finding a pattern of intense and repeated solicitations within a defined geographic area, to establish "cease-and-desist zones," within which real estate licensees[2] are forbidden from directing in-home solicitations to homeowners who have registered in advance with the Secretary of State their wish not to receive such solicitations.

In 1991, the New York State Association of Realtors challenged the nonsolicitation orders on First Amendment grounds, and this Court, applying the test for commercial speech, ruled the nonsolicitation regulation promulgated pursuant to subsection 442–h(2) invalid because the Secretary had failed to provide direct and concrete evidence of the harm that was alleged to justify the restriction. *See NYSAR*, 27 F.3d at 842–44. Accordingly, the Court

---

1. N.Y. Exec. Law § 296(3–b) (McKinney 2001) states:

 It shall be an unlawful discriminatory practice for any real estate broker, ... for the purpose of inducing a real estate transaction ... to represent that a change has occurred or will or may occur in the composition with respect to race, creed, color, national origin, sex, disability, marital status, or familial status of the owners or occupants in the block, neighborhood or area in which the real property is located, and to represent, directly or indirectly, that this change will or may result in undesirable consequences in the block, neighborhood or area in which the real property is located....

2. The prohibition extends not only to real estate brokers and salespersons licensed by the Department of State, referred to collectively as "real estate licensees," but also to real estate speculators, who are "regularly engaged in the trade or business of buying and selling real estate." N.Y. Real Prop. Law § 442–h(3) (McKinney 2001).

concluded that the Secretary had failed to establish a "reasonable fit" between the degree of the harm and the scope of the restriction. *See id.* at 844.

Under subsection 442–h(3),[3] the Secretary can create cease-and-desist zones in those areas where he determines that "owners of residential real estate property . . . are subject to intense and repeated solicitations by real estate brokers . . . to place their property for sale." In these zones, real estate licensees are prohibited from soliciting a listing from any owner who has filed a statement with the Secretary of State expressing the wish not to be solicited, and whose name appears on the cease-and-desist list. A rule establishing such a zone is effective for five years, after which the Secretary can re-adopt the rule or it will expire.

Current regulations promulgated pursuant to subsection 442–h(3) establish five cease-and-desist zones, and delineate their boundaries. N.Y. Comp.Codes R. & Regs. tit. 19, § 175.17(c)(2) (2001). The regulations prohibit a real estate licensee from "solicit[ing] the sale, lease or the listing for sale or lease of residential property" from an owner in the cease-and-desist zone who has signed onto the cease-and-desist list. *Id.* § 175.17(c)(1). "Solicitation" is defined as "an attempt to purchase or rent or an attempt to obtain a listing of property for sale, for rent or for purchase,"[4] and the solicitation ban extends to "use of the telephone, mails, delivery services, personal contact or otherwise causing any solicitation, oral or written," to be left for the owner or anyone else at the owner's home address. *Id.* § 175.17(d)(1). The solicitation ban does not cover classified advertising in non-real estate publications, advertisements placed in public view, or radio or television advertisements. *Id.* § 175.17(d)(2). The regulations define res-

---

3. N.Y. Real Prop. Law § 442–h(3)(a) (McKinney 2001) provides:

If the secretary of state determines that some owners of residential real property within a defined geographic area are subject to intense and repeated solicitation by real estate brokers and salespersons to place their property for sale with such real estate brokers or salespersons, or are subject to intense and repeated solicitation by other persons regularly engaged in the trade or business of buying and selling real estate to sell their real estate, the secretary of state may adopt a rule establishing a cease and desist zone, which zone shall be bounded or otherwise specifically defined in the rule. After the secretary of state has established a cease and desist zone, the owners of residential real property located within the zone may file an owner's statement with the secretary of state expressing their wish not to be solicited by real estate brokers, salespersons or other persons regularly engaged in the trade or business of buying and selling real estate. The form and content of the statement shall be prescribed by the secretary of state. After a cease and desist zone has been established by the secretary of state, no real estate broker, salesperson or other person regularly engaged in the trade or business of buying and selling real estate shall solicit a listing from any owner who has filed a statement with the secretary of state if such owner's name appears on the current cease and desist list prepared by the secretary of state. The prohibition on solicitation shall apply to direct forms of solicitation such as the use of the telephone, the mail, personal contact and other forms of direct solicitation as may be specified by the secretary of state.

4. The two uses of the word "purchase" in the definition of "solicitation" are unclear. The first use, covering "an attempt to purchase," apparently refers to a speculator's attempt to purchase a homeowner's home for resale. The second use, covering "an attempt to obtain a listing of property for . . . purchase," is less clear; normally a "listing" refers to a property offered for sale. We need not pursue this aspect of the definition because none of the parties has attached any significance to the definition of "solicitation" or mentioned the uncertainty as to the meaning of "purchase."

idential property as one-, two-, and three-family houses, including co-ops and condos. *Id.* § 175.17(e).

Currently, approximately 20,000 home-owners are on the cease-and-desist list, with more than 14,000 in Queens County. The Secretary determines whether any particular communication is an unlawful solicitation by investigating the content of the communication and the intent of the licensee in sending the communication. The regulation has been applied broadly to prohibit most communications by licensees to residents located at homes on the cease-and-desist list, and licensees have been found to have violated the regulations by distributing business cards, or having promotional advertisements in mass distributed coupon packs that arrive at homes on the cease-and-desist list.

The Plaintiffs are real estate profession-als licensed by the Department of State, offering services in New York, including areas that have been designated cease-and-desist zones by the Defendant. They contend that, in order to obtain real estate listings, they rely upon direct, in-home so-licitations, including in-home visits, tele-phone calls, and literature delivered direct-ly to homeowners. Plaintiff Parker brings the suit as a sales agent reasonably fearing prosecution and risking sanction for viola-tion of subsection 442–h(3). He alleges that he has had particular difficulty devel-oping his business due to this restriction. The Plaintiffs allege that the solicitation of listings is critical to the success of a real estate licensee, and that there is no cost-effective alternative to communicating truthful, non-deceptive information about the real estate market, the licensee, the licensee's company, and the nature of their services.

Plaintiffs Hosein and Anderson were charged by the Defendant with a disciplin-ary violation due to Hosein's mailing a flier to an addressee on the cease-and-desist list for Queens County. The flier introduced Hosein to potential clients, and detailed some of the services provided by his com-pany, Coldwell Banker Halmike Realty. The flier concluded with the following sen-tence, which the Secretary of State deemed to be a solicitation for a listing: "If you have considered selling or buying a home now or in the near future, or simply want to find out what your home is worth in today's market, don't hesitate to call." Hosein and Anderson pled no contest to the charge of violating section 175.17 by soliciting a listing for the sale of residential property, and entered into a consent order with the Department of State, pursuant to which each paid a $300 fine.

The Plaintiffs commenced this action pursuant to the Constitution and 42 U.S.C. § 1983 in the United States District Court for the Eastern District of New York in February 1999. On cross-motions for summary judgment, the District Court granted the Plaintiffs' motion for summary judgment, concluding that subsection 442–h(3) and the regulations promulgated thereunder were unconstitutional. The District Court applied the test for content-based regulations of speech, *see United States v. Playboy Entertainment Group, Inc.,* 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000), and deemed the stat-ute underinclusive as to the stated goal of homeowner privacy because it did not pro-scribe solicitation by other types of solici-tors, *see City of Cincinnati v. Discovery Network, Inc.,* 507 U.S. 410, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). Accordingly, the Court concluded that the remedy did not "reasonably fit" with the problem it sought to address, *see Central Hudson Gas & Electric Corp. v. Public Service Commission of New York,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980), and that the State had failed to show that less

restrictive, content-neutral solutions were not available.

## Discussion

### I. Level of First Amendment Protection

■ One important determinant of the degree of protection afforded by the First Amendment is whether the activity sought to be regulated constitutes commercial or noncommercial speech. *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983). The "core notion" of commercial speech is that "which does no more than propose a commercial transaction." *Id.* at 66, 103 S.Ct. 2875 (internal quotation marks omitted). Even a communication combining commercial and noncommercial elements, if it is an advertisement, makes reference to a specific product, and the speaker has an economic motivation for the communication, is properly characterized as commercial speech. *Id.* at 66–67, 103 S.Ct. 2875.

■ The Plaintiffs acknowledge that their communications include "truthful, non-deceptive information about themselves, the real estate market, the nature of their services, and those of their company." Brief for Appellees at 22. They claim that the regulations prevent them from providing "invaluable information regarding market conditions, financing and refinancing alternatives, and purchase/sale opportunities which would not otherwise come to the attention of area residents, their families, neighbors and friends." *Id.* at 22–23. In making the "common-sense" distinction between commercial and noncommercial speech, *Bolger,* 463 U.S. at 64, 103 S.Ct. 2875, we place this type of speech squarely into the category of commercial speech.

■ Somewhat side-stepping the commercial speech category, the Plaintiffs contend, in agreement with the District Court, that because the statute and regulation target only real estate solicitations, their constitutionality should be evaluated under the rigorous test applicable to content-based regulations of speech. Although some members of the Supreme Court have questioned whether the *Central Hudson* analysis should be applied in particular commercial speech cases, *see Greater New Orleans Broadcasting Association, Inc. v. United States,* 527 U.S. 173, 184, 119 S.Ct. 1923, 144 L.Ed.2d 161 (1999) (Stevens, J.); *id.* at 197, 119 S.Ct. 1923 (Thomas, J., concurring in judgment); *44 Liquormart, Inc. v. Rhode Island,* 517 U.S. 484, 517, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996) (Scalia, J., concurring in part and in judgment); *Discovery Network,* 507 U.S. at 416 n. 11, 113 S.Ct. 1505 (Stevens, J.), the Court has rejected the argument that strict scrutiny should apply to regulations of commercial speech that are content-specific, adhering instead to the somewhat less rigorous standards of *Central Hudson.* See *Thompson v. Western States Medical Center,* —— U.S. ——, —— – ——, 122 S.Ct. 1497, 1503–04, 152 L.Ed.2d 563, —— – —— (2002) (acknowledging the challenge to the *Central Hudson* analysis, but finding "no need in this case to break new ground"); *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 554–55, 121 S.Ct. 2404, 150 L.Ed.2d 532 (2001) (refusing to apply strict scrutiny to tobacco-specific regulations, and finding *Central Hudson* an adequate basis for commercial speech cases); *see also Long Island Board of Realtors, Inc. v. Incorporated Village of Massapequa Park,* 277 F.3d 622, 626 (2d Cir.2002) (rejecting the argument that a municipal ordinance regulating the display of signs should be subject to a heightened level of scrutiny as a content-based regulation).

### II. The *Central Hudson* Test

*Central Hudson* sets forth a four-part framework for considering whether com-

mercial speech may be validly restricted. First, for commercial speech to merit any First Amendment protection, it "must concern lawful activity and not be misleading." Next, the government must assert a substantial interest to be achieved by the restriction. If both these conditions are met, the third and fourth parts of the test are "whether the regulation directly advances the governmental interest asserted" and whether the regulation "is not more extensive than is necessary to serve that interest." *Central Hudson,* 447 U.S. at 563–66, 100 S.Ct. 2343.

### A. Substantial State Interest

■ In this case, the Secretary does not dispute the District Court's conclusion that the prohibited solicitations contain speech that is lawful and not misleading. To meet the second step of the analysis, the Secretary identifies two governmental interests promoted by subsection 442–h(3): (1) the State's interest in protecting neighborhoods from blockbusting, and (2) the State's interest in protecting the privacy of homeowners from harassing in-home real estate solicitations.[5] Because the State's regulatory scheme is sustainable solely on the homeowners' privacy interest, we need

not consider the interest in avoiding blockbusting.

The homeowners' privacy interest is "substantial" within the meaning of *Central Hudson.* The Supreme Court has declared that protecting the "well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 625, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995) (internal quotation marks omitted); *Frisby v. Schultz,* 487 U.S. 474, 484–85, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) (noting, in upholding ban on residential picketing, that "a special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions"); *see also Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton,* — U.S. —, 122 S.Ct. 2080, —, — L.Ed.2d — (2002) (noting that "residents' privacy" is among "important interests that the Village may seek to safeguard through some form of regulation of solicitation activity."). The Court has observed that "[e]ven solicitation that is neither fraudulent nor deceptive may be pressed with such frequency or vehemence as to intimidate, vex, or harass the recipient. . . . [P]rotection of the

**5.** The Plaintiffs complain that the Secretary has belatedly sought to rely on privacy as the asserted state interest, and that privacy is not mentioned in the statute, regulation, or legislative findings. However, the Secretary need not rely on the justifications offered by the State when the statute was enacted, since any insufficiency in the original motivation "does not diminish other interests that the restriction may now serve." *See Bolger,* 463 U.S. at 71, 103 S.Ct. 2875; *Ohralik v. Ohio State Bar Association,* 436 U.S. 447, 460, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978); *see also Greater New Orleans Broadcasting,* 527 U.S. at 187, 119 S.Ct. 1923 ("[E]nacted congressional policy and 'governmental interests' are not necessarily equivalents for purposes of commercial speech analysis."). While courts cannot supplant with hypothetical interests the precise

interests put forward by the state in defense of its regulation, *see Edenfield v. Fane,* 507 U.S. 761, 768, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993), the Supreme Court has repeatedly applied the *Central Hudson* test with reference to the interests asserted by the state in litigation challenging the regulation. *See Western States Medical Center,* — U.S. at —, 122 S.Ct. at 1504; *Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 624–25, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995); *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 484–85, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995); *see also Western States Medical Center,* — U.S. at —, 122 S.Ct. at 1507 (noting that with respect to an interest described by the dissent, "[n]owhere *in its briefs* ... does the Government argue that this interest motivated the advertising ban") (emphasis added).

public from these aspects of solicitation is a legitimate and important state interest." *Edenfield v. Fane*, 507 U.S. 761, 769, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993) (internal citations and quotations omitted); *see also Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 462, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978). As the District Court noted, the Secretary asserts such a situation here, stating that many homeowners feel "harassed, overwhelmed, threatened, and offended by the extensive telephonic, mail, flyers, and personal direct solicitation they receive." Accordingly, the interest in protecting homeowners from such harassing solicitations is a substantial state interest.

### B. "Reasonable Fit"

■ The third and fourth steps coalesce to require "a reasonable fit between the legislature's ends and the means chosen to accomplish those ends." *Lorillard Tobacco*, 533 U.S. at 556, 121 S.Ct. 2404 (internal quotations marks omitted). The party seeking to uphold a restriction on commercial speech carries the burden of justifying it, and cannot satisfy this burden by "mere speculation or conjecture" but "must demonstrate that the harms it recites are real and that its restrictions will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71, 113 S.Ct. 1792.

■ The record adequately demonstrates that the harm to homeowners' privacy from real estate solicitations is real, and that the cease-and-desist zones advance that interest directly and to a material degree. The popularity of the program, statements at the public hearings in support of the cease-and-desist zones, and complaints of violations of the registry all support the contention that homeowners feel harassed by the amount and the intensity of the solicitations, and that the cease-and-desist zones have alleviated that harm. Although a prohibition that makes only a minute contribution to the advancement of the state interest is not considered to have advanced the interest "to a material degree," *see Edenfield*, 507 U.S. at 771, 113 S.Ct. 1792; *Bad Frog Brewery, Inc. v. New York State Liquor Authority*, 134 F.3d 87, 100 (2d Cir.1998) ("[A] state must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from a beach of vulgarity."), the State's evidence satisfies the "material degree" standard.

As to reasonable fit, the regulation can hardly be accused of being "more extensive than necessary"; it is precisely co-extensive with those who are experiencing the particular harm that it is designed to alleviate. This is the kind of resident-activated restriction that was endorsed by the Supreme Court in *Rowan v. United States Post Office Department*, 397 U.S. 728, 737, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970), and more recently in *Playboy*, 529 U.S. at 815, 120 S.Ct. 1878; *see also Watchtower Bible*, 122 S.Ct. at —— (observing, as to regulation of activities including religious proselytizing, that provision for posting of "No Solicitation" signs and recognizing right to refuse conversation "provides ample protection for the unwilling listener"). In *Rowan*, the Court reviewed a statute under which a person could require a mailer of material that he deemed to be "erotically arousing or sexually provocative" to remove his name from its mailing lists and stop all future mailings to the householder. 397 U.S. at 729–30, 90 S.Ct. 1484 (internal quotation marks omitted). The Court rejected the argument that the statute violated the mailers' right to communicate, concluding that such a right could be limited "by an affirmative act of the addressee giving notice that he wishes no further mailings from that mail-

er." *Id.* at 737, 90 S.Ct. 1484. In *Playboy,* the Court explicitly endorsed the practice of "targeted blocking," whereby unwanted channels could be blocked on a household-by-household basis. 529 U.S. at 815, 120 S.Ct. 1878. The Court deemed this to be a less restrictive alternative to banning, though still a feasible and effective means of furthering the Government interest in shielding children from sexually-oriented programming. *Id.* In *NYSAR,* this Court, in invalidating a broader prohibition on real estate solicitations, characterized the cease-and-desist registry as a "type of narrower, resident activated measure," that was reasonably tailored, yet still effective. 27 F.3d at 844.

 The District Court, however, concluded that because the regulation covered only real estate solicitations, it was not a reasonable fit with the interest in homeowners' privacy. The Court deemed the regulation fatally underinclusive for not proscribing solicitation by other categories of solicitors. However, in the commercial speech context, the Supreme Court has made clear that underinclusiveness will not necessarily defeat a claim that a state interest has been materially advanced, *see Posadas,* 478 U.S. at 342–43, 106 S.Ct. 2968; *Metromedia,* 453 U.S. at 511, 101 S.Ct. 2882. As the Court noted, a state is not required to "make progress on every front before it can make progress on any front." *Edge Broadcasting,* 509 U.S. at 434, 113 S.Ct. 2696.

In *Florida Bar,* for example, where the Florida Bar asserted substantial interests in protecting the privacy of victims against intrusive contact by lawyers and in protecting the reputation of Florida lawyers, *see* 515 U.S. at 624–25, 115 S.Ct. 2371, the Court upheld the 30–day restriction on direct-mail solicitations of victims despite objections that the privacy invasions and the harm to the reputation of the profes-

sion were also consequences of other kinds of attorney advertising and solicitation, *see id.* at 640–41, 115 S.Ct. 2371 (Kennedy, J., dissenting). In concluding that the restriction on "pure commercial advertising" was constitutional, the Court noted that, particularly where the standards and conduct of professionals have traditionally been subject to extensive regulation by the States, "it is all the more appropriate that we limit our scrutiny of state regulations to a level commensurate with the subordinate position of commercial speech in the scale of First Amendment values." *Id.* at 635, 115 S.Ct. 2371 (internal quotation marks and citations omitted). Similarly, in rejecting challenges to a municipal ordinance prohibiting the use of commercial signs on residential property, this Court concluded that the governmental interests in aesthetics and safety were directly advanced by the ordinance, despite arguable objections that the prohibition was underinclusive with respect to those goals. *See Long Island Board of Realtors,* 277 F.3d at 627–28.

Supreme Court decisions that have invalidated commercial speech restrictions for lack of a reasonable "fit" reflect concerns not implicated by the cease-and-desist zones. In *Rubin v. Coors Brewing Co.,* 514 U.S. 476, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995), the regulatory scheme was defective by reason of its "overall irrationality," *id.* at 488, 115 S.Ct. 1585, and in *Greater New Orleans Broadcasting,* the scheme was "so pierced by exemptions and inconsistencies that the Government cannot hope to exonerate it," 527 U.S. at 190, 119 S.Ct. 1923. Neither criticism applies to the regulations establishing cease-and-desist zones. In *Discovery Network,* the Court invalidated a ban on newsracks distributing commercial handbills but not those distributing newspapers because the benefit in safety and aesthetics was "mini-

mal" compared to the total number of newsracks on the public right of way, 507 U.S. at 418, 113 S.Ct. 1505, and because the distinction between commercial and noncommercial speech bore "no relationship *whatsoever*" to the interests asserted, *id.* at 424, 113 S.Ct. 1505. Here, however, the cease-and-desist zones have been identified because of the high volume of citizen complaints about real estate solicitations sent to homes, the restriction applies only to those seeking insulation from such solicitations, and the Plaintiffs' objection relies on the distinction *among* categories of commercial solicitations, not between commercial and noncommercial solicitations.

In distinguishing between real estate solicitation and other kinds of commercial solicitation, the challenged scheme is more analogous to *Metromedia* than to *Discovery Network*. In *Metromedia*, the Court found the distinction between onsite and offsite commercial advertising on the same property justifiable, although the two might be equally distracting and unattractive, because "the city may believe that offsite advertising ... presents a more acute problem than does onsite advertising." 453 U.S. at 511, 101 S.Ct. 2882; *see also Posadas*, 478 U.S. at 342–43, 106 S.Ct. 2968 (evidence supported distinction between casino gambling and other games of chance); *cf. Pearson v. Edgar*, 153 F.3d 397, 404 (7th Cir.1998) ("The district court found as a fact that the state produced 'no evidence in this case that real estate solicitation harms or threatens to harm residential privacy.' ") (quoting *Pearson v. Edgar*,

965 F.Supp. 1104, 1108–09 (N.D.Ill.1997)). New York's system of identifying zones in which real estate solicitations are voluminous and permitting homeowners in these zones to elect not to receive such solicitations at their homes has a reasonable "fit" with the governmental interest in protecting privacy, and the record supports the use of that system in the zones at issue in this case.

To the extent that some commercial speech restrictions are vulnerable out of concerns about paternalism,[6] the challenged restriction entirely avoids such concerns because it applies only where homeowners elect to seek its protection.

Construing the evidence in the light most favorable to the Plaintiffs, we conclude that there is no genuine issue of material fact. The Secretary has produced evidence of harassing residential real estate solicitations, and the only issue raised by the Plaintiffs is whether this record is sufficient to sustain the regulation. We consider the record sufficient, and conclude that on their face subsection 442–h(3) and the regulations promulgated pursuant to that statute do not violate the First Amendment rights of the Plaintiffs.

■■■ The statute also does not violate the Equal Protection Clause. "Insofar as the [statute] does not violate the First Amendment, its definitions and distinctions need only be rationally related to legitimate governmental interests." *General Media Communications, Inc. v. Co-*

---

6. *See, e.g., Western States Medical Center*, —— U.S. at ——, 122 S.Ct. at 1507 ("We have previously rejected the notion that the Government has an interest in preventing the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information."); *Coors Brewing*, 514 U.S. at 497, 115 S.Ct. 1585 (Stevens, J., concurring in judgment) ("[T]he Constitution is most skeptical of supposed state interests that seek to keep people in the dark for what the government believes to be their own good."). *But see 44 Liquormart*, 517 U.S. at 517, 116 S.Ct. 1495 (Scalia, J., concurring in part and in judgment) ("[I]t would also be paternalism for us to prevent the people of the States from enacting laws that we consider paternalistic, unless we have good reason to believe that the Constitution itself forbids them.").

*hen,* 131 F.3d 273, 276 (2d Cir.1997). Where the plaintiffs have failed to show a violation of the First Amendment, strict scrutiny is inapplicable, and the statute is evaluated under rational basis review. *See Fighting Finest, Inc. v. Bratton,* 95 F.3d 224, 231 (2d Cir.1996). As already discussed, the Secretary has shown a legitimate reason for targeting real estate licensees. *See also Posadas,* 478 U.S. at 344 n. 9, 106 S.Ct. 2968 ("If there is a sufficient 'fit' between the legislature's means and ends to satisfy the concerns of the First Amendment, the same 'fit' is surely adequate under the applicable 'rational basis' equal protection analysis.").

### Conclusion

Accordingly, the statute on its face and as applied is constitutional, and the regulations promulgated thereunder do not violate the First Amendment rights of the Plaintiffs. The judgment of the District Court is therefore reversed, and the case is remanded with directions to enter judgment for the Secretary.