FEDERAL TRADE COMMISSION; Timothy J. Muris, Chairman of the Federal Trade Commission, in his official capacity; Sheila F. Anthony, Commissioner, Federal Trade Commission, in his official capacity; Mozelle W. Thompson, Commissioner, Federal Trade Commission, in his official capacity; Orson Swindle, Commissioner, Federal Trade Commission, in his official capacity; Thomas B. Leary, Commissioner, Federal Trade Commission, in his official capacity; and J. Howard Beales III, Director, Bureau of Consumer Protection, in his official capacity, Petitioners,

v.

MAINSTREAM MARKETING SERVICES, INC., a Colorado corporation; TMG Marketing, Inc., a Colorado corporation; American Teleservices Association, Respondents.

No. 03-1429.

United States Court of Appeals, Tenth Circuit.

Filed Oct. 7, 2003.

Sean R. Gallagher, Marianne N. Hallinan, HOgan & Hartson, Denver, CO, Robert Corn-Revere, Ronald G. London, Davis Wright Tremaine, Washington, DC, for plaintiffs–appellees.

John D. Graubert, Lawrence DeMille-Wagman. William E. Kovacic, John F. Daly, federal Trade Commission, Washington, DC, for defendants–appellants.

Mark B. Stern, Alisa B. Klein, U.S. Department of Justice, Civil Division, Appellate Staff, Washington, DC, for Intervenor.

Andrew Patrick McCallin, State of Colorado Department of Law, Denver, CO, for Amici Curiae.

Before SEYMOUR, EBEL, and HENRY, Circuit Judges.

## ORDER

PER CURIAM.

The Federal Trade Commission (Petitioner) ("FTC") challenges an order of the United States District Court for the District of Colorado permanently enjoining the FTC from implementing provisions in its amended Telemarketing Sales Rule creating a national do-not-call list. The Rule created a federal registry of telephone numbers of consumers who have indicated that they do not wish to receive unsolicited telephone calls from commercial telemarketers, and it prohibits those telemarketers from making sales calls to consumers on the list.[1] The Federal Communications Commission (FCC), in coordination with

---

1. Commercial telemarketers are exempt from the FTC's do-not-call prohibitions if they have received express written consent from the consumers they call, or if they call consumers

the FTC, has also ordered the establishment of a national do-not-call list. The only issue to be decided at this time is the FTC's request for a stay of the district court's order pending this Court's decision on the merits.

## I. Standard for Granting Stay

■ The FTC's request for a stay is governed by Federal Rules of Appellate Procedure 8 and 18. To obtain a stay under these rules, the FTC must address the following factors: (1) the likelihood of success on appeal; (2) the threat of irreparable harm if the stay or injunction is not granted; (3) the absence of harm to opposing parties if the stay or injunction is granted; and (4) any risk of harm to the public interest. *Homans v. City of Albuquerque*, 264 F.3d 1240, 1243 (10th Cir. 2001); 10th Cir. R. 8.1.

As an initial matter, the district court suggested that an additional inquiry overlays this Court's analysis of whether to grant a stay of the district court's order pending appeal. Specifically, it cited decisions from this Court setting out the following types of preliminary injunctions as "disfavored": (1) one that disturbs the status quo; (2) one that affords the movant substantially all the relief the movant may recover at the conclusion of a full trial on the merits; and (3) one that is mandatory as opposed to prohibitory. *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1247 n. 4 (10th Cir.2001); *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1098–99 (10th Cir.1991). The concerns arising from the first two types of "disfavored" injunctions are relevant only in a merits review of a preliminary injunction issued by a district court, typically on an incomplete record. Those concerns do not, however, constrain our decision whether to stay a lower court's permanent injunction issued after consideration of a complete record.[2] The concern about mandatory injunctions is not a factor in this case because a decision to stay the district court's permanent injunction does not constitute a judicial mandate requiring any of the litigants to take any action. Such a stay order would suspend an injunction, not impose one. Therefore, we do not apply the heightened scrutiny required for "disfavored" preliminary injunctions.

■ With respect to the four stay factors,[3] where the moving party has established that the three "harm" factors tip decidedly in its favor, the "probability of success" requirement is somewhat relaxed. *Prairie Band*, 253 F.3d at 1246; *Continental Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 781–82 (10th Cir.1964). Under those

---

with whom they have an established business relationship. Telemarketing Sales Rule, 68 Fed.Reg. 4580, 4629 (Jan. 29, 2003).

**2.** When issuing a preliminary injunction, a district court typically bases its decision on an incomplete record. *See, e.g., N. Arapahoe Tribe v. Hodel*, 808 F.2d 741, 753 (10th Cir. 1987). As such, there is a heightened risk of issuing a preliminary injunction that will ultimately prove to be inconsistent with the court's final adjudication on the merits, resulting in irreparable injury to a party. Where, as here, there has been a full adjudication on the merits by the district court and we are considering whether to stay the district court's *permanent* injunction pending appeal, we have the benefit of a full, developed record on which to base our decision. Thus, the concerns that would trigger heightened review in the context of a preliminary injunction proceeding do not arise in the context of an appeal of a permanent injunction taken after a final judgment on the merits.

**3.** In our evaluation of these four stay factors, we have considered, inter alia, the enabling statutes, legislative history, FTC and FCC regulations and agency records, the district court's decision on the merits and its order denying a stay pending appeal, the parties' motions and responses filed in this Court, and various amicus submissions.

circumstances, probability of success is demonstrated when the petitioner seeking the stay has raised "questions going to the merits so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Prairie Band*, 253 F.3d at 1246–47 (internal quotations omitted).

▪ We conclude that, on balance, the three "harm" factors alone do not support a relaxed review of the probability of success factor. With respect to the second and fourth factors—which are necessarily conflated because the FTC's asserted injury is exclusively one involving the public interest—we conclude that the public does have strong privacy and expectation interests that weigh in favor of granting this stay pending review of the merits. Yet the third factor—injury to opposing parties if the stay is granted—weighs against granting the stay because Respondents will likely suffer harm if the FTC's do-not-call regulation comes into effect and is later determined to be unconstitutional, even though their injury would be tempered by our granting expedited review of this case on the merits.[4] Although we conclude that on balance the harm factors tip in the FTC's favor, those factors do not weigh so heavily towards the FTC as to justify a relaxed review of the final factor, likelihood of success on the merits. Therefore, we will grant a stay only if the FTC shows a substantial likelihood of success on the merits of its appeal. We turn then to that analysis.

## II. Likelihood of Success on the Merits

▪ The Supreme Court has identified a 3–step test to analyze First Amendment challenges to restrictions applied to lawful and non-misleading commercial speech. Regulation of such commercial speech passes constitutional muster if (1) the government asserts a substantial interest to be achieved by the restrictions; (2) the restriction directly advances that governmental interest; and (3) the restriction is narrowly tailored to meet that interest. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Together, the final two factors in the *Central Hudson* analysis require that there be a "fit between the legislature's ends and the means chosen to accomplish those ends." *United States v. Edge Broad. Co.*, 509 U.S. 418, 427–28, 113 S.Ct. 2696, 125 L.Ed.2d 345 (1993). The government bears the burden of demonstrating both a substantial interest and the fit between that interest and the challenged restriction. *Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1069 (10th Cir.2001). The *Central Hudson* test does not require that the regulation be the least restrictive means of achieving the interest asserted, but only that it be narrowly tailored to meet the desired objective. *Board of Trs. of the State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989).

▪ For purposes of First Amendment analysis, to show a reasonable fit the government must "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486–87, 115 S.Ct. 1585, 131 L.Ed.2d 532 (1995). However, in

---

4. Although the amended Telemarketing Sales Rule apparently would place perhaps fifty million phones off limits, that still leaves a very large population of phones that would be called during the time that this Court considers the appeal on its merits, and such phones are likely to represent more responsive potential buyers of goods and services that are marketed by telemarketing calls.

response to a First Amendment challenge to a regulation, the government is not limited in the evidence it may use to support the asserted harms; it may demonstrate its justification with anecdotes, history, consensus, and simple common sense. *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 628, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995). Moreover, while the fit must be reasonable and in proportion to the interest served, it need not be a perfect fit or the best fit. *Fox*, 492 U.S. at 480, 109 S.Ct. 3028. "Within the bounds of the general protection provided by the Constitution to commercial speech, we allow room for legislative judgments." *Edge Broad. Co.*, 509 U.S. at 434, 113 S.Ct. 2696. We do not require "that the Government make progress on every front before it can make progress on any front." *Id.*

A. *Substantial Governmental Interest*

The FTC's do-not-call list includes commercial telemarketers but specifically excludes calls from charitable organizations. The FTC has asserted that this distinction between commercial and non-commercial speech is justified by (1) a greater risk of abusive practices associated with commercial calls, and (2) commercial solicitation's greater impact on consumer privacy, based both on the greater number of commercial calls and upon the less welcome nature of commercial calls.[5] The district court found, and Mainstream Marketing Services does not dispute, that these asserted interests in preventing abusive practices and protecting residential privacy are substantial under the first prong of *Central Hudson*.

The Supreme Court has held that there is undoubtedly a substantial governmental interest in the prevention of abusive and coercive sales practices. *See Edenfield v. Fane*, 507 U.S. 761, 768–69, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993). The prevention of intrusions upon privacy in the home is another paradigmatic substantial governmental interest. In *Rowan v. United States Post Office Department*, the Supreme Court held that protecting individual privacy is an important governmental interest, especially in the context of the home. 397 U.S. 728, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970). The Court recognized "the right of a householder to bar, by order or notice, solicitors, hawkers, and peddlers from his property." *Id.* at 737, 90 S.Ct. 1484. "The ancient concept that

---

5. The district court believed that the FTC admitted in its regulation that privacy interests cannot justify a distinction between commercial and charitable telemarketing calls. (Mem. Opinion & Order at 7.) We disagree.

Before the FTC amended its Telemarketing Sales Rule, certain charitable organizations asked the agency not to include non-commercial callers in any do-not-call list (neither a national do-not-call list nor a company-specific do-not-call list). Although the FTC decided not to include charitable callers in a national do-not-call list, it was unwilling to exclude them from its company-specific do-not-call list if particular homeowners wanted to designate them specifically. In this context, the FTC stated that charitable callers, in addition to commercial callers, had an effect on homeowners' privacy, and thus should not be completely immune from a consumer-initi-

ated restriction. The FTC stated that "the encroachment upon consumers' privacy rights by unwanted solicitation calls is not exclusive to commercial telemarketers" and it therefore concluded that some regulation was appropriate even in the non-commercial context. 68 Fed. Reg. 4637. However, the FTC never found that commercial and non-commercial callers affected homeowners' privacy interests to the *same* degree. Rather, it emphasized "fundamental differences" between commercial and charitable solicitation that make commercial callers more likely to "engage in all the things that telemarketers are hated for." *Id.* Because of this distinction, the FTC found it appropriate to subject commercial telemarketers to the national do-not-call registry, but to regulate charitable callers only under the less burdensome company-specific do-not-call rules. *Id.*

'a man's home is his castle' into which 'not even the king may enter' has lost none of its vitality." *Id. See also Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 164–65, 122 S.Ct. 2080, 153 L.Ed.2d 205 (2002) (noting that "residents' privacy" is among "important interests that the Village may seek to safeguard through some form of regulation of solicitation activity"); *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.") (quotation omitted). In the context of telephone solicitations, this privacy interest is not limited to the ringing of the phone; rather, how invasive a phone call may be is also influenced by the manner and substance of the call.

Therefore, the FTC's justifications of preventing abusive and coercive sales practices and protecting privacy are substantial governmental interests. We turn now to analyzing whether the FTC has established a likelihood of success on its contention that the do-not-call list bears a reasonable fit with these interests.

## B. *Reasonable Fit*

### 1. *Relevant Factors in Analyzing Reasonable Fit*

Although a regulation may draw a line between commercial and non-commercial speech, that distinction must bear a relationship to the legitimate interests the government seeks to achieve. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 424, 428, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993). For example, a distinction between commercial and non-commercial speech could be justified by reference to the differing impact those categories of speech have on esthetics, safety, privacy, or the like. In contrast, the distinction

may not be justified on a perceived "low value" of commercial speech. *Id.* at 428, 113 S.Ct. 1505.

In *Discovery Network*, the Supreme Court struck down a city ordinance banning freestanding commercial newsracks on grounds that the restriction was not narrowly tailored. 507 U.S. at 412, 430, 113 S.Ct. 1505. The Court recognized that the city had substantial interests in esthetics and safety that were impaired by freestanding newsracks, but concluded that there was no reasonable fit between those goals and the city's policy of banning only commercial newsracks while leaving similar non-commercial newsracks undisturbed. *Id.* at 418, 113 S.Ct. 1505. Although the Court recognized that there may be situations where "differential treatment of commercial and noncommercial newsracks" could be justified by a reasonable fit with the government's interest in esthetics and safety, it held that the government had failed to make any such showing in that case. *Id. See also Missouri v. Am. Blast Fax, Inc.*, 323 F.3d 649, 655–56 (8th Cir.2003) (holding that unsolicited commercial fax prohibition in Telephone Consumer Protection Act was a reasonable fit with substantial governmental interest of reducing costs and intrusion, because commercial faxes are more intrusive than non-commercial faxes).

Whether a commercial solicitation restriction meets the "reasonable fit" test depends in part on the existence of private choice on the part of homeowners. In *Martin v. City of Struthers*, the Supreme Court struck down a city ordinance banning door-to-door canvassing because it took the right to decide whether to receive visitors away from the individual's own private choice. 319 U.S. 141, 148–49, 63 S.Ct. 862, 87 L.Ed. 1313 (1943). While recognizing the government's interest in protecting privacy, the Court held that the

ordinance swept too broadly because the dangers of door-to-door canvassing easily could have been controlled by giving the householder the right to decide whether to receive visitors. *Id.* at 144, 147–48, 63 S.Ct. 862. *See also Watchtower Bible,* 536 U.S. at 168–69, 122 S.Ct. 2080 (stating that provision facilitating residents' own utilization of "no solicitation" signs was less restrictive than permit requirement and sufficient to further state's privacy interest); *United States v. Playboy Entm't Group, Inc.,* 529 U.S. 803, 815, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (stating that targeted consumer-initiated blocking is "less restrictive than banning, and the Government cannot ban speech if targeted blocking is a feasible and effective means of furthering its compelling interests").

*Rowan* demonstrates that the element of private choice in an opt-in feature is relevant for purposes of analyzing "reasonable fit." In *Rowan,* the Court upheld an opt-in do-not-mail list system in which a homeowner could require that a commercial advertiser remove his or her name from its mailing list if the homeowner determined in his or her "sole discretion" that the material received was erotically arousing or provocative. *Rowan,* 397 U.S. at 730, 90 S.Ct. 1484. In finding the privacy regulation reasonable, the Court emphasized the element of private choice, stating that the homeowner was the "exclusive and final judge of what will cross his threshold." *Id.* at 736, 90 S.Ct. 1484.

Other courts have relied on *Rowan*'s analysis in finding that similar mechanisms of private choice in solicitation restrictions weigh in favor of finding a "reasonable fit." *See, e.g., Anderson v. Treadwell,* 294 F.3d 453, 462–63 (2d Cir.2002) (noting, in its "reasonable fit" analysis, that resident-activated solicitation restriction was narrowly tailored and of the kind "endorsed by the Supreme Court in *Rowan*"); *Pearson*

*v. Edgar,* 153 F.3d 397, 404 (7th Cir.1998) (invalidating solicitation restriction as lacking "reasonable fit" because, unlike *Rowan,* "[h]ere, the state, not the homeowner, has made the distinction between real estate solicitations and other solicitations without a logical privacy-based reason").

■ In sum, a regulation drawing a line between commercial and non-commercial speech must have a reasonable fit with substantial governmental interests. The "reasonable fit" analysis will at least partially depend upon whether the initiation of the solicitation restriction is at the hands of private citizens or the government. Additionally, we will consider the extent to which the regulatory scheme will materially advance the governmental interest, *see Discovery Network,* 507 U.S. at 418, 113 S.Ct. 1505, and the disparity in treatment between commercial and non-commercial speech.

2. *The FTC's Record Evidence Supporting a Reasonable Fit Between the National Do–Not–Call List and its Asserted Justifications*

In light of the above legal standards, we must review the record to determine the FTC's asserted rationales for applying its national do-not-call restrictions only to commercial sales calls, and the evidence to support those rationales. Here, the FTC attempts to justify this distinction by showing that commercial telemarketing is more abusive and coercive than charitable telemarketing and constitutes a greater intrusion upon consumer privacy. We are mindful that these rationales overlap to some extent.

In reviewing the FTC's rationales for its amended rules and the evidence in support of those rationales, it is important to keep in mind that the myriad of statutes, legislative history, and administrative rules addressing federal telemarketing regulation

are largely interconnected and involve both the FCC and the FTC. Instead of repeating factual findings and policy rationales in each separate enactment, the FTC and FCC have often incorporated those findings by cross-reference. For instance, in creating a company-specific do-not-call list applicable only to commercial telemarketers in the original Telemarketing Sales Rule (which the FTC enacted pursuant to the Telemarketing and Consumer Fraud and Abuse Prevention Act, or "TCFPA"), the FTC "considered, among other things, the approach taken by Congress and the FCC in the TCPA and its implementing regulations."[6] Telemarketing Sales Rule, 68 Fed. Reg. 4580, 4591 (Jan. 29, 2003). *See also* FCC Rules and Regulations Implementing the Telephone Consumer Protection Act (TCPA) of 1991, 68 Fed. Reg. 44144, 44145 (July 25, 2003) ("[W]e agree with the vast majority of consumers in this proceeding and the FTC that a national do-not-call registry is necessary to enhance the privacy interests of those consumers that do not wish to receive telephone solicitations."); Do–Not–Call Implementation Act, Pub. L. 108–10 at § 3 (Mar. 11, 2003) ("In issuing such rule, the Federal Communications Commission shall consult and coordinate with the Federal Trade Commission to maximize consistency with the rule promulgated by the Federal Trade Commission."). Therefore, we must examine each of these interrelated telemarketing enactments in evaluating the asserted justifications for the FTC's distinction between commercial speech and non-commercial speech. We briefly discuss here the most relevant of these acts and regulations.

### a. *Telephone Consumer Protection Act (TCPA)*

In the TCPA, Congress found that unrestricted telemarketing can be an intrusive invasion of privacy and that many consumers are outraged by the proliferation of intrusive calls to their homes from telemarketers. Pub.L. 102–243 at § 2 (Dec. 20, 1991). Therefore, Congress in the TCPA authorized the FCC to establish a national database of residential subscribers who object to receiving "telephone solicitations." *Id.* at § 3. A "telephone solicitation" was defined as a "telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services," excluding, inter alia, calls from a tax exempt nonprofit organization. *Id.* This definition excluded charitable telemarketers.

According to the legislative history accompanying the TCPA, "the record suggests that most unwanted telephone solicitations are commercial in nature. Complaint statistics show that unwanted commercial calls are a far bigger problem than unsolicited calls from political or charitable organizations." H.R.Rep. No. 102–317, at 16 (1991). The House Report cited statistical data from several states reporting that consumer complaints were directed mostly at commercial sales calls. *Id.* Moreover, the Committee found that non-commercial calls were less intrusive to consumers because they are more expected and because there is a lower volume of non-commercial calls. *Id.* It concluded that "the two main sources of consumer problems—high volume of solicitations and unexpected solicitations—are not present in solicitations by nonprofit organizations .... It is on this basis that the Committee believes that the scope of the regulation is a workable 'commercial speech' distinction consistent with Supreme Court precedent." *Id.* at 16–17. This distinction

---

**6.** The TCPA is the Telephone Consumer Protection Act of 1991.

between commercial and non-commercial telemarketing, justified in the TCPA, persists in all subsequent legislation and administrative rules regulating telemarketing calls.

### b. *Telemarketing and Consumer Fraud and Abuse Prevention Act* (TCFPA)

In the TCFPA, Congress directed the FTC to prescribe rules prohibiting deceptive and abusive telemarketing acts and practices, including calls that a reasonable consumer would consider coercive or abusive of such consumer's right to privacy. Pub. L. 103–297 at § 3 (Aug. 16, 1994). Congress found that consumers lose an estimated $40 billion each year in "telemarketing" fraud and are victimized by other forms of "telemarketing" deception and abuse. *Id.* at § 2. Significantly, Congress in the TCFPA defined the term "telemarketing" as calls "conducted to induce purchases of goods or services,"—e.g., commercial calls. *Id.* at § 7. This is the Act under which the FTC enacted the national do-not-call regulations challenged in this case.

### c. *1995 Telemarketing Sales Rule*

In 1995, acting pursuant to the TCFPA, the FTC established a company-specific do-not-call provision, which prohibited telemarketers from making sales calls to persons who had previously stated their desire not to receive such calls from that solicitor. Telemarketing Sales Rule, 60 Fed. Reg. 43842, 43854–55. This rule did not apply to an entity such as a charitable organization that was not "organized to carry on business for its own profit or that of its members." *Id.* at 43843 n. 14. Accordingly, the distinction between commercial and non-commercial speech, first enacted in the TCPA, was present in the initial FTC Telemarketing Sales Rule. In justifying this rule, the FTC relied in part on the TCFPA and its legislative history, which emphasized that sellers of goods and services regularly subjected consumers to deception and abuse infringing upon their privacy rights. *Id.* at 43842. Moreover, the FTC later explained that when enacting this original Telemarketing Sales Rule it also considered the TCPA (which as noted above explicitly drew a distinction between commercial and non-commercial solicitations in its legislative history) and related FCC action. 68 Fed. Reg. at 4591.

### d. *2003 Amended Telemarketing Sales Rule*

In its amended Rule (the subject of the instant litigation), the FTC established a national do-not-call registry that allowed individuals to block all commercial sales calls, with certain exceptions. 68 Fed. Reg. 4580, 4629. Most significantly to this case, the FTC preserved the distinction between commercial and non-commercial calls by limiting "coverage of the national registry to telemarketing calls made by or on behalf of sellers of goods or services, thus exempting telemarketing calls on behalf of charitable organizations." *Id.* The "sellers of goods or services" limit relates back to Congress' findings in the TCFPA, which had documented a history of abuses specifically committed by telemarketers selling goods or services.

Importantly, the amended FTC Telemarketing Sales Rule did subject charitable organizations to the company-specific do-not-call provision. *Id.* In this amended Rule, the FTC retained the basic distinction between commercial and non-commercial calls already present in the earlier version of the Telemarketing Sales Rule, although the amended rule resulted in stricter requirements for both categories of calls.

The FTC found that the original Rule's company-specific do-not-call list was inad-

equate to prevent the type of abusive commercial sales calls it was intended to prohibit. *Id.* at 4629, 4631. The FTC concluded that "[T]he registry is ... designed to cure the inadequacies as a privacy protection measure that became apparent in the company-specific 'do-not-call' provisions included in the original Rule." *Id.* at 4635. For example, the FTC referred to complaints that commercial telemarketers ignored consumers' repeated requests to be placed on company-specific do-not-call lists. *Id.* at 4629.[7] It concluded that the national do-not-call list will also prevent fraud or abuse in some cases by protecting vulnerable consumers from exploitative telemarketers. *Id.* at 4635, n. 669.

Furthermore, the FTC specifically found that "fundamental differences between commercial solicitations and charitable solicitations may confer upon the company-specific 'do-not-call' requirements a greater measure of success with respect to preventing a pattern of abusive calls from a fundraiser to a consumer than it was able to produce in the context of commercial fundraising." *Id.* at 4637. Specifically, it reasoned that in an advocacy call, such as a charitable solicitation, a significant purpose of the call is to "sell" a cause, not simply to receive a donation. Therefore, the FTC found that it would be self-defeating for a non-commercial caller to engage in abusive telemarketing practices that invade personal privacy because such conduct could alienate the recipient against the cause the caller was attempting to

promote. *Id.* "When a pure commercial transaction is at stake, callers have an incentive to engage in all the things that telemarketers are hated for. But non-commercial speech is a different matter." *Id.* In enacting these provisions, the FTC cited both the TCFPA and the TCPA, noting that "Congress knowingly put the FTC on the same path that the FCC had trod." *Id.* at 4638.

### e. *2003 FCC Rules and Regulations*

Finally, in July 2003, the FCC enacted regulations to "establish, with the Federal Trade Commission (FTC) a national do-not-call registry." 68 Fed. Reg. at 44144. Similar to the FTC's do-not-call regulations, the FCC list was not designed to apply to charitable callers. Citing the legislative history to the TCPA (which, as noted before, contained a congressional justification for distinguishing between commercial and non-commercial calls), the FCC reaffirmed that most unwanted telephone solicitations are commercial in nature and that charitable calls are less intrusive to consumers. *Id.* at 44153. The FCC rule also provided for a company-specific do-not-call system for consumers who elect not to register for the national list. *Id.* at 44155.

### f. *Summary*

Congress expressly made factual findings in the TCFPA that telemarketing calls "conducted to induce purchases of goods or services" have subjected consum-

---

7. It is true that the FTC did not have comparable experience regarding whether a company-specific do-not-call list would be ineffective as to charitable callers because up to that point in time charitable callers had not been subjected to a company-specific do-not-call list. However, the fact that the FTC did not yet have a record as to the need to include charitable callers on a national do-not-call list does not mean that it could not at least ad-

dress the problem as to which it did have an adequate record—that the more limited company-specific do-not-call list was ineffective to prevent invasions of privacy and abusive practices among *commercial* solicitors. *United States v. Edge Broad. Co.,* 509 U.S. at 434, 113 S.Ct. 2696 (noting the government is not required "to make progress on every front before it can make progress on any front").

ers to substantial fraud, deception, and abuse. Pub. L. 103–297 at §§ 2, 7. Consequently, in enacting a national do-not-call registry, the FTC "decided to limit coverage of the national registry to telemarketing calls made by or on behalf of sellers of goods or services." 68 Fed.Reg. 4629. Furthermore, the FTC's revised Telemarketing Sales Rule states that the agency relied on TCPA and FCC authority when it initially endorsed the distinction between commercial and non-commercial calls. *Id.* at 4591. The legislative history accompanying the TCPA, citing complaint statistics, found that commercial telemarketing intrudes upon personal privacy more than non-commercial telemarketing.

### 3. *The FTC's Likelihood of Success*

In light of this record, it appears that the FTC is likely to succeed on its argument that the distinction in the Amended Telemarketing Sales Rule between commercial and non-commercial phone solicitation passes muster under *Central Hudson*'s reasonable fit analysis. The line between these two types of speech is not drawn solely on the basis of the lesser degree of scrutiny applied to commercial speech. *See Discovery Network,* 507 U.S. at 428, 113 S.Ct. 1505. Rather, we examine the constitutionality of the distinction under the *Central Hudson* test with reference to the substantial governmental interest in preventing the greater risk of privacy invasion and abusive sales practices correlated with commercial telemarketing.

We find it relevant that the national do-not-call list is of an opt-in nature, which provides an element of private choice and thus weighs in favor of a reasonable fit. The list is not invoked until the homeowner makes a private decision to invoke it. *See Rowan,* 397 U.S. at 737, 90 S.Ct. 1484; *Playboy Entm't Group,* 529 U.S. at

815, 120 S.Ct. 1878. We also find it relevant that the FTC has not exempted non-commercial speech totally from all regulation, as consumers are also given some mechanism to block non-commercial solicitations by means of company-specific objections to solicitations by charitable organizations. And it is permissible for the FTC to act now to fix a problem upon which it has record support (the inadequacy of company-specific do-not-call lists to prevent invasion of privacy and abusive practices in the context of commercial calls) without waiting until it can develop experience on whether or not a company-specific do-not-call list will be effective to prevent such abuses in the context of non-commercial telemarketing. *Edge Broad. Co.,* 509 U.S. at 434, 113 S.Ct. 2696. Finally, this is not a regulatory scheme that will only affect a "minute" portion of the problematic speech because the great majority of all telemarketing calls—and therefore the preponderant source of the problem of invasion of privacy and abusive calls—are commercial calls which are covered by the FTC's rule. *See Discovery Network,* 507 U.S. at 418, 113 S.Ct. 1505.

In the context of analyzing whether to stay the district court's injunction, we conclude there is a substantial likelihood that the FTC will be able to show a reasonable fit between the substantial governmental interests it asserted and the national do-not-call list or, in other words, that the list directly advances the government's substantial interests and is narrowly tailored. *See Central Hudson,* 447 U.S. at 566, 100 S.Ct. 2343.

### III.  Conclusion

In light of our conclusions as to the three harm factors addressed above, we will stay the district court's order only if the FTC shows substantial likelihood of success on the merits. After reviewing

the record and the parties' submissions, we are satisfied the FTC has met its burden.

We ORDER the district court's permanent injunction preventing implementation of the FTC's national do-not-call list stayed pending final resolution of this appeal on the merits. We further ORDER that the petition for review on the merits be expedited. The FTC shall file its opening brief on October 17. Mainstream Marketing shall file its responsive brief on October 31. The FTC shall file any reply on November 7. Oral argument will be held in Tulsa, Oklahoma, on November 10, 2003.[8]

---

**8.** We also GRANT the states' September 30 motion for leave to file a brief as amici and the additional states' October 1 motion to join the amici brief.